22 A.3d 303 (2011)
INTEGRATED BIOMETRIC TECHNOLOGY, LLC d/b/a L-1 Enrollment Services, Petitioner
v.
DEPARTMENT OF GENERAL SERVICES, Respondent.
No. 1052 C.D. 2010.
Commonwealth Court of Pennsylvania.
Argued March 8, 2011.
Decided May 11, 2011.
Jayson R. Wolfgang, Harrisburg, for petitioner.
Michael C. Barrett and Joshua K. Harman, Harrisburg, for respondent.
BEFORE: LEADBETTER, President Judge, and BUTLER, Judge (P), and FRIEDMAN, Senior Judge.
OPINION BY Senior Judge FRIEDMAN.
Integrated Biometric Technology, LLC d/b/a L-1 Enrollment Services (L-1), petitions *304 for review of the May 21, 2009, order of the Department of General Services (DGS), which denied L-1's protest of DGS's rejection of the proposal L-1 submitted in response to a request for proposals (RFP) for digital fingerprinting and electronic federal criminal background check services. We reverse.
DGS issued the RFP and received proposals from Cogent Systems, Inc. (Cogent), from L-1 and from two other entities. The proposals contained three components: technical, cost and disadvantaged business (DB).[1] The Issuing Officer examined the cost portion of each RFP for responsiveness. As a result of the examination, the Issuing Officer asked Cogent to clarify its subcontracting costs. In response, Cogent submitted a revised cost sheet, stating that Cogent mistakenly added subcontracting costs twice on the original cost sheet.[2] (Findings of Fact, Nos. 1, 8-12.)
The Issuing Officer removed the financial records from the technical part and gave them to a team within the Bureau of Procurement for analysis of vendor financial capability. The rest of the technical part was given to the evaluation committee. The DB component was given to the Bureau of Minority and Women Business Opportunities. The Issuing Officer retained the cost portion. (Findings of Fact, Nos. 13-16.)
The Bureau of Procurement team analyzed the financial records of each offeror, using eleven financial ratios considered to be key financial indicators by Dun & Bradstreet. A score of six or greater indicated that the offeror would be financially capable of handling a large statewide contract. L-1 received a score of three, and Cogent received a score of eight. (Findings of Fact, Nos. 18-20.)
Because of L-1's low financial ratio score and because DGS had reason to believe that L-1's cost submittal showed an insufficient understanding of the cost structure of the contract, the Issuing Officer sent L-1 a letter requesting clarification. The Issuing Officer's letter did not express concern about L-1's financial position. In response, L-1 affirmed that it understood the cost structure of the contract and that its bid pricing was consistent with other programs in the industry of similar size and complexity. L-1 gave examples of other states that used a cost structure similar to the one that L-1 proposed. (Findings of Fact, Nos. 22, 24, 26-27.)
After the evaluation committee reported its results to the Issuing Officer, DGS selected Cogent and L-1 to proceed to the Best and Final Offer (BAFO) phase of the evaluation process. However, in its BAFO letter to L-1, DGS stated that it still had concerns about L-1's cost proposal, and, if L-1 did not increase its pricing, DGS may reject L-1's proposal as not responsible. (Findings of Fact, Nos. 29-31.)
Cogent and L-1 each submitted its BAFO, with L-1 increasing its prices in response to DGS's letter. On March 12, 2010, the Issuing Officer recommended to Deputy Secretary Anne Rung that DGS select Cogent for contract negotiations. The Issuing Officer determined in the recommendation that L-1 was not responsible. On March 13, 2010, the Deputy *305 Secretary signed and approved the recommendation; this was the first time that the Deputy Secretary had any direct involvement in the RFP process. (Findings of Fact, Nos. 33-38.)
On March 16, 2010, the Issuing Officer sent a letter to L-1, informing L-1 of DGS's conclusion that L-1 was not a responsible offeror based on L-1's lack of financial resources to perform the requested services. On March 23, 2010, L-1 filed a protest challenging DGS's conclusion. (Findings of Fact, Nos. 39-41.)
The Deputy Secretary then directed Chief Procurement Officer Jeffrey I. Mandel, the contracting officer, to de-brief L-1 on its non-selection and to provide L-1 with copies of the selection memorandum, Cogent's proposal and Cogent's BAFO. The Deputy Secretary advised L-1 that, if it did not supplement its protest within seven days after receiving those items, DGS would dismiss the protest as clearly without merit. L-1 submitted a supplemental protest; Mandel submitted a response; and L-1 submitted a reply. (Findings of Fact, Nos. 42-47.)
L-1's protest was assigned to the Deputy Secretary for disposition. At that point, L-1 requested that the Deputy Secretary recuse herself because she had signed and approved the recommendation to select Cogent. The Deputy Secretary denied the request, stating:
The [recommendation] memorandum does not mention or address [L-1's] financial position or otherwise state that L-1 was not financially responsible.[[3]] Since I am expressly finding that L-1's low pricing, standing alone, was not a sufficient ground for [DGS] to find L-1 as not responsible, that finding directly contradicts L-1's claim that I would be unable to admit an error in the [r]ecommendation memorandum which I approved.
Further . . . [i]n reviewing and signing the letter, I did not make any decision in regard to the selection of Cogent. That decision was already made by the [DGS] Chief Procurement Officer based upon the Issuing Officer's recommendation. The Recommendation for Selection letter would not have been submitted to me for approval without Mr. Mandel's knowledge and authorization.[[4]] Since I did not in fact have any role in determining L-1 to be non-responsible, I cannot be said to have assumed a prosecutorial role against L-1, and therefore find it unnecessary to recuse myself. See Cardiac Science v. DGS, 808 A.2d 1029 (Pa.Cmwlth.2002). . . .
L-1 mistakenly argues that I have played the role of contracting officer. . . . I was not the contracting officer. Jeffrey Mandel, the Chief Procurement Officer . . . was the contracting officer. . . . The resulting contract will *306 not be signed by me. . . .[[5]] I only reviewed the Bureau of Procurement's selection decision and authorized the Bureau of Procurement to proceed with contract negotiations. . . .[[6]]
Despite the fact that recusal is not necessary in the present case, I have, out of an abundance of caution, used legal counsel who had no involvement in, or input into, the original decision to find L-1 not responsible to assist in the drafting of this determination.[[7]]
(Adjudication, 5/21/10, at 8.)
As to whether DGS erred in concluding that L-1 was not financially capable to perform the requested services, the Deputy Secretary stated:
I agree that financial ratio analyses by themselves are not sufficient to support a finding that an offeror is not financially capable of performing the contract. However, these analyses do create strong reservations in regard to L-1's financial soundness, which must then be examined and investigated using a more detailed analysis of a firm's [Securities and Exchange Commission] SEC filings and other available information.
(Adjudication at 9.) The Deputy Secretary pointed out that, in their submissions to the Deputy Secretary, Mandel and L-1 both referred to L-1's most recent 10-K and 10-Q filings with the SEC. After examining them, the Deputy Secretary stated:
As part of its growth strategy, L-1 has undertaken to provide secure credentialing services at a significant upfront [sic] cost. Were L-1 flush with cash, this would not be a problem. However, for the past four quarters, L-1 has shown a negative cash flow, which has depleted its cash reserves while leaving it heavily in debt. Its acquisition strategy has also proved risky, resulting in a $529 million write down for fiscal 2008. At the same time, L-1 has been unable to show a consistent profit.
While I find that L-1 does perform the services listed in this RFP for a price that is comparable to the pricing in its proposal, I also find that charging such rates leaves L-1 with very little or no real profit potential, and a limited ability to service its significant debt load should something go wrong. At some point in the future, L-1 may start to see significant revenue . . . however, such an outcome is uncertain. As L-1 itself noted in its 10-K, current market conditions are adverse for all businesses, and particularly for the segment L-1 relies upon most heavily for its clients, governmental agencies. Given such a large potential for risk, I feel it would be unreasonable for the Commonwealth to engage in such a lengthy contract with L-1 at this time.
(Adjudication at 11.) The Deputy Secretary rejected other arguments made by L-1 *307 and denied L-1's protest. L-1 now petitions this court for review of the Deputy Secretary's decision.[8]
L-1 argues that, in concluding that L-1 was not financially capable of performing the requirements of the contract, the Deputy Secretary violated section 1711.1(e) of the Code, 62 Pa.C.S. § 1711.1(e). Specifically, L-1 maintains that the Deputy Secretary considered additional information in L-1's 10-K and 10-Q filings without providing L-1 an opportunity to address that information. We agree.
Section 1711.1(e) of the Code provides as follows:
(e) Evaluation of protest.The head of the purchasing agency or his designee shall review the protest and any response or reply and may request and review such additional documents or information he deems necessary to render a decision and may, at his sole discretion, conduct a hearing. The head of the purchasing agency or his designee shall provide to the protestant and the contracting officer a reasonable opportunity to review and address any additional documents or information deemed necessary by the head of the purchasing agency or his designee to render a decision.
62 Pa.C.S. § 1711.1(e) (emphasis added).
Here, the Deputy Secretary deemed it necessary to review L-1's 10-K and 10-Q filings to determine L-1's financial capability. Thus, the Deputy Secretary made "[t]he most recent 10-K and 10-Q issued by L-1 . . . part of the record sua sponte." (Findings of Fact, No. 50.) However, the record contains no evidence indicating that the Deputy Secretary provided L-1 a reasonable opportunity to address the specific information that the Deputy Secretary considered.
DGS claims that the Deputy Secretary provided L-1 an opportunity to address these additional documents when the Issuing Officer sent L-1 the March 16 letter stating that L-1 was determined not to be financially capable of performing the services. In that letter, the Issuing Officer stated:
[DGS] has conducted further investigation of L-1's ability to perform the project. Recent public statements made by L-1 Identity Solutions concerning the desire to sell off some or all of its business, and the significant revenue losses posted for the last two fiscal quarters, do not provide the Commonwealth with sufficient confidence to consider one of its divisions, L-1 Enrollment Services, for Contract selection at the below-market prices which L-1 has proposed.
(R.R. at 291a.) First, the Issuing Officer is not the Deputy Secretary. Thus, this letter identifies only the information considered by the Issuing Officer, not the information considered by the Deputy Secretary. Second, section 1171.1(e) of the Code relates to the Deputy Secretary's evaluation of L-1's protest, and the Issuing Officer's March 16 letter was sent before March 23, the date L-1 filed its protest. Third, the letter does not specifically state that DGS's further investigation involved L-1's most recent 10-K and 10-Q filings. Fourth, the letter only informs L-1 of the determination by DGS; it does not *308 request a response from L-1 for the consideration of the Deputy Secretary in the evaluation of a possible protest.
DGS also claims that the Deputy Secretary provided L-1 an opportunity to address the information in L-1's most recent 10-K and 10-Q when an attorney representing DGS informed L-1 in an email sent on March 26 in preparation for the de-briefing that, in determining that L-1 lacked the financial capability to perform the project, DGS considered the financial information appearing on a webpage link provided by L-1 in its proposal. (See R.R. at 65a, 620a.) DGS asserts that the webpage link contained L-1's 2009 10-K and 10-Q filings. (DGS's Brief at 10.) However, the email is not from the Deputy Secretary, and the email relates to the material that DGS previously considered, not the additional material that the Deputy Secretary would be considering in her evaluation of L-1's protest.
Based on the foregoing, we conclude that the Deputy Secretary violated section 1711.1(e) of the Code in making her determination that L-1 is not financially capable of performing the contract requirements.
Accordingly, we reverse.[9]
Judges LEAVITT and BROBSON did not participate in the decision in this case.

ORDER
AND NOW, this 11th day of May, 2011, the order of the Department of General Services, dated May 21, 2009, is hereby reversed. The contract award in this case is cancelled, and any existing contract is declared void.
NOTES
[1] The technical score represented 60% of the total score; the cost score represented 20% of the total score; and the disadvantaged business score represented 20% of the total score. (Findings of Fact, No. 2.)
[2] L-1 points out that DGS required a response by 3:00 p.m. on Friday, November 20, 2009, (R.R. at 574a), but Cogent did not submit its revised cost proposal until 4:47 p.m. on that date, (R.R. at 722a).
[3] Part III(D) of the recommendation letter states:

D. NON-RESPONSIBLE PROPOSALS: It was determined that one (1) Offeror did not possess the capability to fully perform the contract requirements. . . . After clarifications and Best and Final Offers, this Offeror (Integrated Biometric Technology d/b/a L-1 Identity Solutions) continued to offer pricing at a level the committee determined to be insufficient to support and sustain over the potential 10-year term of the Contract, [sic] all the activities and services required for this project.
(R.R. at 687a.)
[4] There is no finding of fact that Mandel knew about or authorized the recommendation, and the record contains no evidence that would support such a finding. Based on the findings of fact, Mandel played no role in the process until L-1 filed its protest and the Deputy Secretary directed him to act as the contracting officer with respect to that protest.
[5] This is incorrect. The contract is part of the record before this court, and an examination of the contract indicates that the Deputy Secretary signed it on August 10, 2010. (R.R. at 1060a.) Mandel did not sign the contract. (Id.)
[6] Part V of the recommendation letter states: "Please indicate your approval/disapproval of this determination below." (R.R. at 689a.) Below are two boxes for either approval or disapproval. The Deputy Secretary placed a check mark in the box next to the following statement: "I approve the recommendation of the Issuing Officer and authorize the Issuing Office to proceed with contract negotiations." (R.R. at 689a) (emphasis added). Because the Deputy Secretary could have chosen to disapprove the recommendation, the Deputy Secretary did more than merely review the selection.
[7] It is not clear from this statement whether the Deputy Secretary or an unknown attorney actually adjudicated L-1's protest.
[8] This court will affirm the determination of the purchasing agency unless it finds from the record that the determination is arbitrary and capricious, is an abuse of discretion or is contrary to law. Section 1711.1(i) of the Commonwealth Procurement Code (Code), 62 Pa.C.S. § 1711.1(i). If this court determines that the award of a contract is contrary to law, then the remedy the court shall order is limited to canceling the award and declaring void any resulting contract. Section 1711.1(j) of the Code, 62 Pa.C.S. § 1711.1(j).
[9] Because of our disposition of the first two issues, we need not address the other matters raised by L-1 in its brief. With respect to the constitutional issue raised by L-1, we note that a court should not reach a constitutional issue if the case can be decided on non-constitutional grounds. In Re Petition for Formation of Independent School District, 962 A.2d 24, 28 n. 7 (Pa.Cmwlth.2008).